B-57182, the Ministry of Defense in Support for the Armed Forces of the Islamic Republic of Iran v. Renay Frym et al. And then we also have the United States of America here. So, all right, each side has 20 minutes. So standing at the podium, I'm assuming it's Mr., is it Karikas? Karikas. Karikas, okay. And you're the only one arguing from your side, right? Yes. Okay. I'm going to have you just step aside for a second because I know we have more than one. All right. My understanding is that the United States that, is it Frym or Frym? Frym. Frym. All right. You're allowing time for the United States. Can you come to the lectern because this, we're recording, right? Certainly, Your Honor. David Strachman for Renay Frym and the Rubin Judgment Creditors. We've agreed with the government to allow them seven minutes of our time or cooperate with them, allow them having seven minutes of our time. And if it's pleased the court, the Rafi Judgment Creditors would take the last seven minutes and I would take the middle, say, six or seven minutes. Okay. Wait, you have 20 total. Right. Okay. So we're talking seven for the United States and so you have the Fryms and then the other is the Rafis. So the Rafis are going to get how much? Seven. Seven? And you're taking six? That's fine, Judge. Okay. And do you have an, have you agreed on an order? We have, Your Honor. After the government and I would argue on behalf of all of us together. Okay. And then Mr. Hershkoff will take the last seven minutes. Okay. So, wait, so is the, I have down MOOC. And so you're going. Oh, okay. I have that written in. So you're going to go second? Or was the United States going second? United States first. Okay. Then me, Your Honor, on behalf of the Rubens. Okay. And then Mr. Hershkoff on behalf of Mrs. Rafi. Okay. All right. Now, just, I'm going to tell you this. When people are splitting time, the other people sitting down get really nervous when you talk to, when you take over your time because they're thinking, okay, 20 minutes total. So-and-so is taking up all my time. All right. This is how I'm going to handle it. That's the time you get. What, what we're designating right here. If the court is asking questions and we want to spend more time with you, those of you sitting down thinking your time is being taken up, I promise you you'll get your time. Okay. You get your minimum time. And if we ask questions more over this side or the other side, you know, you will get your time. How, because the point here is, as I think all of you as experienced advocates know, the point is for the court to have its questions answered. And we like to give you an opportunity to say the things you want to say, but it's more important, obviously, that the people that are deciding the case have, have direct view. So I, but I've noticed people that sometimes they get really nervous and thinking I'm not going to have any time left and they want to leap to the podium and pull someone off. So that's, that's how we'll proceed then. All right. Thank you. All right. You can come back now. We're ready for you. Thank you. May it please the court. I'm Steve Karakas and I represent the Ministry of Defense of Iran. I'd like to speak for 10 minutes and save 10 for rebuttal to respond to the various arguments. Okay. This case concerns whether lien claimants who have judgments against Iran can attach the proceeds of a judgment, which Iran obtained as reimbursement for property rights and November 1979. The government of Iran contends that the judgment, which has been attached, represents the proceeds of a combat training system, which it purchased prior to November 1979, and that these proceeds should be returned under the Algiers Accords. Well, why isn't the Supreme Court's decision in Elahi fatal to your arguments about the Algiers Accord and whether the cubic judgment is a blocked asset under President Obama's executive order? Well, there's two reasons for that. First of all, the Elahi case really didn't turn on the issue of was it a blocked asset? Was it not a blocked asset? In its final analysis, the Elahi decision decided that Elahi had signed a, had taken money under the Victims, Victims and Violence Protection Act and therefore had waived any claims against Iran. So that's the first part. The second part is that I'm trying to find a, there's a quote in Elahi where Elahi actually discusses the fact that, it leaves open the door, it says, and this is Elahi at 556, U.S. at 379. It said, they say, quote, finally, even if we were to assume, as the Ninth Circuit has held, that the relevant asset were Iran's pre-1981 interest in the air combat training system itself, we should still conclude that the asset was not blocked at the time of the decision below. As the government points out, such an interest falls directly within the scope of Executive Order 12281, an unblocking order which required property owned by Iran be transferred as directed by the government of Iran. So I think that it was dicta and even in the Elahi case, they left open this, this door because of the language I just quoted. So, I don't think it's... When you started out, you made an argument that tried, in my book, to try to put this, this stuff be what they're trying to attach to be prior to a certain date. When I read your argument to the Supreme Court, it seemed to be made an absolutely contrary argument. In fact, you said, MOD could not have any interest in the cubic judgment until such time as a U.S. court had recognized as an enforceable and international arbitral award granting it an action to collect the award. Any attempt to backdate Iran's potential interest in the cubic judgment to a time prior to January 1981 should be unavailing. Okay, you're quoting from what? I'm recording from your argument to the Supreme Court in the case that Judge Callahan just talked about. Okay, yes. And I'm saying, why are you changing your argument? Does it just change for whoever you're in front of? Well, I think that, first of all, it wasn't me personally who argued it. I'm not saying you personally. I'm just saying you, as the entity in front of me, made one argument to the Supreme Court of the United States, and now you stand in front of this court, and you make a totally contrary argument. And to me, that seems a little bit, well, disingenuous to be number one. But number two, I'm a lawyer. I'm a black robe. It doesn't make me a lawyer. But I never argued a tort as a contract or a contract as a tort to different judges just because I was in front of them. And this bothers me. Well, I think the fact that it wasn't a determinative issue in the Elahi case is important. Why is that important? Just because it wasn't an issue, you can make whatever arguments you want about it and then change it thereafter? Well, I mean, to be quite honest, the U.S. government also changed its position. It previously argued... I understand what the U.S. government does or doesn't do. But I'm asking you specifically because I think it's an important point. I think it's a very important point as to what is the arbitral award, what is it we're really talking about here. And if you're going to represent that it was after January 1981, then there's no question they can sock into it if it isn't a blocked asset. Correct. So why change? And why should I accept your argument now and not the one you made before? Well, I don't think that race judicata applies because it wasn't... I'm not talking race. I'm talking just a representation to the court. I'm not trying to put your ethics on the line. I'm just trying to say, why should I accept your argument now and not take the argument you made then? Why is it a better argument? I didn't argue that and I really can't address it. I really can't say why they took that position. I never took that position and I wouldn't have urged Iran to take that position at that time. Well, let me ask you since if we find that a cubic judgment is a blocked asset under President Obama's executive order 13359, do we need to address whether the cubic judgment is a blocked asset under President Bush's executive order under 13382? I don't think you do. I mean, if you find it's a blocked asset under President Obama's, I mean, that would, I think, end your analysis. Well, let me ask you, can't President Obama's executive order and President Bush's executive order be read harmoniously when blocking the assets of a nation involved in the proliferation of weapons of mass destruction and the other blocking Iranian assets due to the concerns with Iranian policy? I think they could be read harmoniously. However, that would also include the fact that there's an exception in President Barack Obama's executive order for those assets which pre-existed November 1979. But the exemption applies to property and interests in property of the government of Iran that had been blocked in 1979 and then unblocked in 1981. But in Elahi, the court held that Iran did not have a property interest in the cubic judgment until 1998. Right, but let me give you a hypothetical. What if the defense contractor, Cubic, had acknowledged, as I believe the Elahi court did and as the United States government has in its brief, that Iran did have a property interest in that contract? And say Elahi had gone ahead and had sold, as it did, to Canada the defense system. But it had done it prior to January 1981 when President Carter issued the unblocking order. Is there any question at all that that money would have been returned to Iran? Of course it would have. So what's different? Why should Iran have been entitled to get that money back but because Cubic Defense would not cooperate and dragged it out and made them go to the Hague and arbitrate it and then we had to come here and under the New York Convention get it entered as a judgment and then had to fight our way all the way up to the Supreme Court in Elahi and all the way back down? Why should that change it and now Iran doesn't get the money? It seems to me that the answer to that question is simple. The same answer you gave the Supreme Court. That is, nothing is gained until I have an arbitration which has been confirmed by the And until I have an arbitration which is confirmed by the district court, I have nothing. And therefore, I have absolutely nothing to attach. That's what you argued to the Supreme Court. And I, again, am back to the same argument. If you had absolutely nothing until the arbitration was confirmed by the district court, then they couldn't attach anything until then. And that put it after the appropriate date. And that's what you argued to the Supreme Court. And frankly, I think you made a pretty good argument. Even in Elahi, the Supreme Court, and I'm looking for this site, the Supreme Court found that Iran had property interest in the contract. On page 376, it So that would have been pre-January 1981 when President Carter unblocked the asset. So it's not that there was nothing, there was something. It wasn't that there was nothing. There was this contractual right, which later was reduced to proceeds, which Cubic withheld and would not release. So I would respectfully differ that there was something. you differ with your argument before? Because it helps you. Let me ask you just one question on how do you respond to the United States' argument that the Algiers Accords does not give Iran special immunity from future creditors, and therefore, attachment of the Cubic judgment would not violate the Isn't the United States' interpretation of the treaty due to great deference by us? It is, but I think there's a confusion going on here. Iran is not immune. Iran has to answer to its creditors, whoever they may be. But it has to answer in assets that the U.S. didn't agree to give back to Iran. They have to answer in assets that are post-January 1981. So it's not a question of immunity to Iran. Iran has no special immunity, absolutely not. But there So I think there's a confusion going on there. Okay, you're like at nine minutes, but I'll put you at 10. Do you want to reserve at this point? Reserve at this point. And, you know, and I'll sort of monitor this depending on so that you get an opportunity to respond since we've got a lot of people on the other side. Okay, so we'll put it at 10 right now. May it please the court. Benjamin Schultz on behalf of the United States is amicus curiae. Keep your voice up. I'm sorry. Is that better, Your Honor? That is. Thank you. Your Honor, the United States has participated in this case to address three issues of significance to the government. First, we've explained in our brief that the Algiers Accords does not bar the plaintiff's attachment in this case. Second, we've explained that the judgment that is being attached here is a blocked asset, and it's a blocked asset under two separate and completely independent sanctions regimes, either of which would be sufficient to render it a blocked asset for purposes of TRIA. And then finally, if the court reaches the issue, we've explained why the district court's interpretation of Section 1610G was incorrect. I'd be happy to address any. Let me just kind of go a little bit backward. On the 1610G argument, it was an alternative ruling. That's exactly right. And, you know, my general jurisprudence is I only reach things that I need to reach. Now, I don't know where we're going to come out on this, but that being said, as an alternative, is would it, if we, if the other issues were favorable to what you're claiming at this point, do we still need to get to, is there some compelling reason to get to that, or would it just be dicta, or would it just go into that? What's the? It's hard to see why there would be a need to reach the 1610G argument in that eventuality. And indeed, as we submitted in a 28-J letter, we pointed out that there's actually another panel in this court, a case called Bennett, and that panel has before it a pending rehearing petition. And there's some dispute as to whether or not that panel has actually already resolved this 1610G question. And so I think, if anything, that just means that it's more prudent to let the Bennett panel. Well, they would have priority in time anyway, I would think. I think that's my understanding of the way this court ordinarily operates. And so it may well be that whatever the Bennett panel does on that 1610G issue, it could resolve it, it could not. But either way, that might be another reason why this court just shies away from the 1610G argument entirely, if it agrees with us. I thought the 16, or the, yes, the 1610G argument is the argument that would win. You're suggesting we ought to wait for that panel before we go forward? Well, Your Honor, it's our view, as we explained in the 28-J letter and as we explained to the Bennett panel, which called for the United States to file an amicus brief as to rehearing. We told that panel that we think that they didn't actually resolve that issue. And so our position is that it's still an open question in this circuit. But we also acknowledge that that opinion could be reasonably read a different way. And so just out of prudence, it might be simpler to see whether or not the Bennett panel modifies its opinion or rehearing en banc is granted. Well, but you're arguing that if the cubic judgment is a blocked asset that may be attached pursuant to the Terrorism Risk Insurance Act, we don't even need to get to that, right? That's correct. That would be a complete reason to affirm the judgment below. And then there would be no need to address the 1610G issue. In your spare minutes, I would assume that you then devote your time not to the alternative holding. Absolutely, Your Honor. If that would be agreeable to you. Absolutely, Your Honor. We'd be happy to focus on the TRIA issues. And as to those issues, this is actually a very simple case, because all of the hard questions have been resolved by the Supreme Court on Wahi. And although Oran's counsel suggests that that part of the Wahi opinion didn't actually resolve this question, I think if the court reads the Wahi opinion, there's no way to read it in any other way. And while it is true that the court ultimately concluded that Wahi couldn't obtain the assets there because Wahi had waived his right under a particular compensation statute, there's an entire section of the opinion joined in by every single member of the court in which they explain why this court's decision in a prior appeal that the judgment was a blocked asset was incorrect. And so unless Oran thinks that the Supreme Court just decided to have an entire section of its opinion to be complete dicta, then it's hard to read that opinion any other way. And in any event, even if the court weren't prepared to say that the Supreme Court had actually held in Wahi that the relevant asset is the judgment and that the judgment is a blocked asset, for all the reasons that the Supreme Court gave in that opinion and for the reasons that Oran has also given, we think the Supreme Court's opinion is absolutely correct. And the only thing that's changed since then is that since the time of the original Ninth Circuit opinion that was under review in Wahi, there have been two additional blocking regimes that have become relevant to the case, such that whereas at the time of the earlier Ninth Circuit panel opinion, the cubic judgment was not a blocked asset, it has since become a blocked asset because of the 2007 executive, the 2007 listing of the ministry under that, under one executive order, and as well because of the 2012 executive order, which blocks interest and property of the government of Oran that come into being after 1981. I would submit that that is an easy way to resolve the case, and if the court has any questions about any of those points, we'd be happy to address them. But otherwise, I think we'll rest on our briefs and the Supreme Court's well-reasoned opinion. Okay, well, you've gained a little time for your other people, so I think you've gained a minute and a half, so that I think then the person that had six maybe can have seven now. Thank you, Your Honor. David Strachman for the Rubin Judgment Creditors, together aligned with Mrs. Raffi. We've gained a lot, frankly, by the government, and in light of the government's position in this case, we are very happy to rely on the government and the positions that it asserts with respect to the Terrorism Risk Insurance Act and the application or non-application of the Algiers Accord. Well, so from your perspective, because of the government's position, what's your position on deference to the positions of the government that you're claiming inure to your benefit? Well, clearly the government's deferred to typically with respect to interpretation of treaties, such as the Algiers Accord. That's black-letter law up and down in all of the cases. It's interpretation of the statutes, excuse me, the executive orders and the regulations that it implements. So we think that their argument is correct. The assets are blocked, have been blocked pursuant to two executive orders. It's a very straightforward collection action from that perspective. The only place that we disagree slightly is with respect to the argument on 1610G, which we asserted below as an alternative method for attachment. And our victims are looking for closure and looking to move this case forward. We wouldn't want anything to impact the resolution of this case. It very well may be that the court can resolve the case without reaching the 1610G. Because the government says that's wrong. The government says that's wrong. That the district court was wrong in its alternative holding. Right. And we've laid out a series of arguments that have, quite frankly, only gotten better since the passage of time. So we disagree with the government. But it may be that the court need not reach that. I say the arguments have gotten better in our position as opposed to the government's position precisely because this court, a panel of this court in the Bennett case ruled that 1610G specifically cannot be subject to another provision in 1610. And it would be illogical to do so. It said it in crystal clear language that there can be no restrictions on 1610G. And 1610G is not to be read, to be restricted by the other provisions. In light of the court in Bennett noted that 1610G specifically referenced a disavowed or banned sex test. Why should we ascribe any other purpose to 1610G? I'm sorry, Your Honor. I didn't hear your question. I apologize. With respect to the alternative holding, rather than reflect any intent to cover noncommercial property, doesn't the inclusion of the five listed factors within Section 1610G simply show Congress's intent to override the multi-factor test established in First National City Bank versus Banco Power El Comercio, exterior, et cetera? The bank check test. Yes. Yes. There's no question that that's what it does, but that's not only what it does. And Chief Judge Moskowitz made it very clear in his decision that if Congress wanted to place a restriction on 1610G, it could have simply placed that language underneath 1610A, and it didn't do that. Congress knows how to draft the statutes. The statute is very clear that it was designed the whole history. We've laid out the history in our brief. The House Report 477 makes very clear the entire purpose of 1610G was to open up the at almost every attempt over the last 20 to 25 years to collect on their judgments. So TRIA was one step that opened up the doors for collection, and 1610G was another one. The problem goes back to the Foreign Sovereign Immunities Act, created in 1976, to codify the restrictive theory of sovereign immunity. But it didn't allow for the right kinds of collection activities, and it didn't anticipate the 1990 amendments to the statute, which allowed terrorism victims to bring cases against state sponsors of terrorism. So the laws gave them judgments but wouldn't allow them to collect. TRIA opened the door. 1610G opened the door. And there's nothing in the language specifically of the – nothing in the legislative history, nothing in the statute, nothing in the plain text of the language, as Chief Judge Moskowitz said. There's nothing in the context or the placement that would suggest that there's a limitation. And it completely dovetails with this Court's beautiful one sentence, if it would be okay to read, the one sentence from Bennett. It says, Thus, reading 1610G to require attachment immunity to be grounded in some other section of 1610 would render 1610G a nullity. And that's what the government and Iran's position is. It would render it effectively a nullity. It would be almost meaningless. That's not why they intended it. So you're saying the government acted by not acting. Congress acted by not acting, by not including another paragraph. No. It acted to open the door for us. It's the burden. The burden is on the government to say why they didn't correlate it with 1610A, as this Court said, as Chief Judge Moskowitz said, as Chief Judge Lamberth said in his slew of decisions in the D.C. Circuit. He's the judge that gets most of these kinds of cases. The Second Circuit said, rejected the same kind of analysis in a slightly different circumstance in Weinstein when it says, quote, nothing — oh, I'm sorry. I'm thinking about something else. I apologize. Let me ask you this. If another panel, Bennett, is still considering this particular matter, and I read through the same stuff you're doing, and I read what Bennett said, but I also know that Bennett isn't through. There's a petition for rehearing. We've got a lot of stuff going on. Wouldn't it be prudent for us to wait for Bennett? I think that's one of the one things we don't respectfully want to do. I understand what you don't want to do, but I expect you understand we're also second to Bennett, that we can't overrule Bennett, and the fact that we have to follow Bennett to the letter means if they're ahead of us in time, they're ahead of us in right. Do you understand that? I do, Judge. All right. Then you'd understand that even if we wanted to use the language of Bennett, it would only be available if Bennett were on the books without any rehearing. Well, then I guess the third harmonizing verse is to decide the case on trial. How do you want to win on the other theory? I mean, in all honesty, our clients have been waiting almost two decades to have justice. These funds were transferred years ago into the court registry. They literally, the bank account, by the way, that Chief Judge Moskowitz set up or directed his clerk to set up has our client's name on it attached with their Social Security number. The money is there. It's ready to go. It's in the court registry in a specific account for them. If in light of what Your Honor just said, maybe the best thing to do is resolve the case solely on the first basis, which I think is... If you win. Yeah. That's right. Yeah. Okay. Thank you. You've used your time. Thank you. And we'll reset the clock to seven minutes for the last argument. Thank you. Good morning, Your Honors. Good morning. Phil Hirschkopf, aptly Mrs. Rafi. I rise only on a procedural point, actually. I'm not going to get to the substance. I was trial counsel in the Rafi case. I hadn't argued any of the appeals. I was trial counsel in the Elahi case, and I've been trial counsel for others involved in this fight against terrorism, fight against Iran. But one thing on the substance, I think Mr. Krakus misspoke in his opening argument when he said that the sale was before the Algiers Accord. It was explicitly Elahi opinion. The sale was in October of 1982, and the Supreme Court found that's the earliest at which they had any claim. And, in fact, we know that in 1979, it's also mentioned in Elahi opinion, they modified that contract where Iran gave up their right to the equipment and said, go sell it in Canada. That's long before that. So they have changed their position, as has been pointed out by Judge Smith, but I do bring to your attention the... Let me ask you a hypothetical question. If we were to find that the relevant interest traces to the air combat maneuvering range system itself, would allowing attachment violate the Algiers Accord? No, I don't believe so. It would have been a blocked asset back then, and I think we would have won in Elahi had that been the case. But there's no way I think you could find that, unless you're going to reject what the I rise on an issue of some temerity to ask you to expedite what decision you're going to make in this case. We did ask that in our brief, in our conclusion. We actually wrote to the court in January of 2015 asking that, and we asked it on grounds that has gone on so long, as counsel has suggested. Dr. Bakhtiar, who was the last prime minister of Iran, was murdered in Paris. He was beheaded. He was disemboweled. His body was carved up. His son came home, who was in the French police to find his father's body and his assistant's body carved up. The Ayatollahs personally commissioned the group that went to get him, and it deeply affects the victims. Judge Lamberth pointed this out in one of his early opinions, in a plateau opinion, that the victims of terrorism are particularly marked by the losses, not just any more so than anyone who loses their father or someone very close to them, the grief you experience. That's subjective to the person very often. But there's an overlying effect that terrorism has.  And I ask that you take into account the time first. We've done that, the equities involved. Dr. Bakhtiar's murder was 25 years ago. The original judgment between Kubrick and Iran was 18 years ago. The D.C. judgment in Rafi was 14 years ago, and the liens placed by Rafi and the Rubin claimants were 13 years ago. It becomes one of the oldest cases in the Ninth Circuit, and a circuit that everyone knows has an enormous caseload. Well, I should just say, I think what I can say to you, and I appreciate that, you know, I know this panel particularly. I mean, this is a case that likely has issues for publication. All right. So, from the standpoint, when you publish an opinion, as opposed to when we do a mem dispos, where we're not publishing on an issue, we get them all out within 30 days after. If you write an opinion, it's that. But I think, you know, I think this panel certainly would take to heart any, you know, we recognize that people are waiting for our decisions, and I don't think that we would contribute undue delay.  So, I, generally speaking, all opinions are supposed to be out within 180 days. We appreciate the honor. If there's a new compelling circumstance has come up. Okay. Well, then let us know. I mean, that's obviously. Under Circuit Rule 2712, you will grant, if there's a showing of good cause, that there be an expedition. And a showing of good cause can be the absence of expedited treatment will cause irreparable harm. We now are faced with the Rafi litigants, not the Rubin litigants, are faced with that problem. In the Consolidated Appropriations Act that Congress passed in December of 2015, they passed Section 404, which is for compensation for victims of terrorism. And so, the act requires that the Justice Department will appoint a special master by February 18th of this year, in the next several days, it turns out. And that, well, the next two weeks. And that then they will issue regulations and we must, within 90 days of the issuance of those regulations, file for a claim. If we are entitled to receive or have received more than 30% of our claim, we go to the back of the line and we get nothing. So, if we don't have an opinion in this court by the time we have to file under that act, because we'll have to say, indeed, we expect to get 50% of our claim from a recovery here. Well, obviously, the drop-dead date is not February 18th. So, what are you talking about, realistically? The drop-dead date, if everything is extended to the last day, would be five months from February 18th, Your Honor. And it put us, well, close to 180 days. But I don't know when they'll issue the regulations. They have 60 days for February 18th to issue regulations. They may come out sooner. And then we can't go to the 90th day to file because we have administrative things to do in dealing with cases like this. So, I bring that to the Court's attention and ask for your deference on that. Counsel, I hear you. Is there no way to file and then withdraw the claim? I don't know, Your Honor. The act doesn't say that. Well, I mean, I've been in your spot before. Yeah. I've been where you are, and we filed. And then we got full reparation from the judgment, which we were seeking, and we withdrew the claim. Not a problem. And I don't know that would apply here, Your Honor. The litigation with respect to the victims of terrorism is just different than anything we've ever done. Well, I understand it's different, but I'd also, well, you'd know better than I. That's why I ask you the question. It seemed to me a little bit of a travesty if you file the claim and then withdraw, and somehow I don't understand the downside of that action. I just wanted to ask. I ask the Court's consideration. Thank you, Your Honor. All right. All right. Then you have 10 minutes for rebuttal. Thank you. First, let me address some incidental points. I would agree with my colleague from the United States that 1610G maintained the commercial-noncommercial distinction, and because there's no question that in this case this was noncommercial property being used, it was a missile maneuvering system, that 1610G, this is noncommercial purpose, and 1610G couldn't apply. There's also the case that the Rubin defendants litigated in Illinois where they tried to attach noncommercial property, and the district court there said you can't do it. The commercial distinction applies. As far as the Bennett case, I don't think it raised this issue. It dealt with whether the 1610G can be applied to an instrumentality of Iran that had separate juridical status, and I don't think it really has any applicability to the issues in our case. I'm going to read the phrase he suggested, and you tell me why it doesn't say what he said. Yes, sir. Okay. It says, and the plain text of 16G requires only that the foreign state be subject to a section 1605A judgment, which they have, before the property of an instrumentality becomes available for collection. Then it gives some examples. Then it says, thus, reading section 1610G to require attachment immunity to be grounded in some other subsection of section 1610, which would be the commercial, would render 1610G a nullity. Okay. Well, you have to remember that the asset in Bennett is clearly a commercial asset. So they're not worried about this distinction. It doesn't pertain to them. You're dealing with, I think it's monies that were held like Visa credit card monies or something like that. So this was clearly a commercial purpose. They weren't concerned about the non-commercial part of it. So I don't, you know, I don't think that that came into play or into the thoughts when it was done, but your honors would know better than me. Well, I don't know any better than you. I just wanted your answer. I got it. The Code of Federal Regulations anticipated that something like this would happen, that there could be an asset which was pre-January 1981, and it was held up for whatever reason. It was disputed. It was held by an American entity or an American national and couldn't be returned right away. I cited Section 31 of the Code of Federal Regulations, Part 535.540, which deals with a person under U.S. jurisdiction who's holding property being disputed with Iran and indicating that when the dispute's over, it's supposed to be returned to Iran. I think that that CFR section or a similar code section would apply here to return to Iran the judgment monies. I spoke to my client, or I had communications with my client by e-mail the past week, asking them what they intended to do if, in fact, your honors declined to grant the appeal. And they indicated they probably would be seeking a petition of certiorari and have asked me that if you're inclined to deny this appeal, that you allow the existing state to be in place until such time as the Supreme Court either denies certiorari or hears the matter. And that being said, I don't think I have much more to say unless your honors have questions for me. You don't appear to. Thank you both for your helpful argument in this matter. This case will stand submitted, and we are now in recess until tomorrow at 9 a.m. Thank you.
judges: D.W. Nelson, Callahan, N.R. Smith